All rise. The Illinois Appellate Court third division is now in session. The Honorable Justice LeRoy K. Martin, Jr. is presiding. Good morning, ladies and gentlemen. Please be seated. People v. Erdene. Counsel, who is going to argue, would you please introduce yourselves for the record? My name is Erika Mayer. I represent Mr. Erdene. Jan Zubovarczyk on behalf of the people of the state of Illinois. Thank you. I would remind you that the microphone before you doesn't amplify, so you'll have to keep your voice up. It is for the purposes of recording our proceedings. Now, it is normally our habit to allow 15 minutes per side. We do make some allowance for the fact that you may be peppered with questions, as it were. And so we will make some allowances for that. But in light of that, how much time would you like in reserve for rebuttal? Yeah, I'll take three minutes. Very good. All right. If with that, if each of you is prepared, then we can certainly begin. Good morning, Your Honors. Counsel, may it please the Court. The State's case against Mr. Erdene relies on three pieces of inadmissible evidence, and I'll discuss those in the same order as in the briefing. So to start with blood and breath tests, the results of these tests should Can I just interrupt you for one second? If we agree with you on the Miranda issue, do we need to address any of the other claims of error? I would say yes, in that for a new trial, the admissibility of the blood and breath tests and the retrograde extrapolation would be relevant at that new trial. But if you grant a new trial on those grounds, then you, yeah, if you grant a new trial on those grounds, that would be before the trial court again. Okay. But for the blood and breath tests, those should have been suppressed because Mr. Erdene did not voluntarily consent to these warrantless searches. These are unusual to consider under just the Fourth Amendment instead of implied consent, but the State here bears the burden to show the voluntariness under the totality of the circumstances. So the question is whether a reasonable person would have felt free to leave or to refuse the search, and under these circumstances, a reasonable person would not have. So both the blood and the breath tests should have been suppressed. I have a question. In the record, does it indicate what happened with the field sobriety test? Do we know what happened at the field sobriety test, what the result was, or what the outcome of it was? There is not probable cause at the end of those field sobriety tests, and so it seems that they certainly were not conclusive in any way, shape, or form. And because of that, I think, is in part why the trial court found that there was only reasonable suspicion at the time that Mr. Erdene was taken to the hospital. And so, again, without under voluntary consent, the State has to demonstrate that the circumstances were such that a reasonable person would feel free to leave or to refuse testing, and where he's observed by police, where he's not allowed to leave, where he asks to use the bathroom and is observed by Officer Tolgese, those are not circumstances where someone would feel free to leave or refuse testing. And so where the circumstances don't allow for voluntary consent, any indications of consent were not voluntary. And in cases like Hayes and People v. Green, the courts have discussed how even if someone, in those cases there's questions of ambiguous indications of consent, but the court said that even if there was affirmative consent, where the circumstances don't allow for voluntary consent, that consent is not voluntary. So these tests, both the blood and the breath test, should have been suppressed. Turning to his statement, he invoked his right both to counsel and to silence, and officers did not scrupulously honor either of those. They should have ceased questioning when he invoked. And the statement should not have been admitted against him because he invoked both of those rights. So I have a sort of sideway related question. Are there any cases that you're aware of involving interpreters when you have a custodial interrogation like the one that took place here? Not in Illinois. There may be a federal case, if Your Honor, I can bring that up. That's okay. I could be a researcher. I just wanted to see if you're aware of any cases. Not in Illinois. But also the question is what a reasonable officer would understand. He said no is what the officers heard, but they did not scrupulously honor that. So where Mr. Ervin said through his interpreter that he did not want to speak to officers. But he ultimately did agree to speak to the officers though, right? But he did not. And they didn't appear to be coerced. No one seemed to be intimidating in any manner, shape, or form, right? I would argue that they continued to press after he invoked that he first invoked his right to his attorney. But when he said what the interpreter says, first said he has an attorney. Sorry, he says he has an attorney. The interpreter, the officer followed up with he has an attorney. The interpreter said yes. He's asking the question, I have an attorney and what I need to do. I think that is not at all an indication of any uncertainty on whether or not he wants his counsel. It's a question about how to access. And then when Officer Nipple asked can you ask him if he wants to talk to me, the interpreter said he said no. That's a red light. Questioning should have ceased. There's no ambiguity. There's no need for follow-up questions where there's no ambiguity. And so when Officer Nipple continued to ask questions to say, you know, if he's willing to sign this paper or refuse to talk to me, there was no need for those follow-up questions because there was no ambiguity about whether or not he invoked. And they should have ceased at that point. What was the trial counsel's strategy in terms of not filing a motion to suppress? I would say it's deficient performance. So there was no trial strategy here? No. Counsel misunderstood the law, I believe. He said he didn't file it because he had thought the issue not quite there. That's a misunderstanding of the law because both of these invocations are well within what Illinois courts have recognized as invocations of right either to counsel or to silence. So that's a misunderstanding there. There's not a strategy. And when counsel realized that this was an invocation, counsel objected at trial. And the court's ruling was incorrect where the court said that he did not invoke either his right to silence or his right to counsel. So that ruling was an error. Both of these are clear. Questioning should have ceased after either invocation. But certainly the statement should not have come in where he invoked both of his rights. So part of the confusion during the custodial interrogation, do you think part of it was attributed to the interpreter? He said no is what officers heard when, that was the response to the question, does he want to, can you ask him if he wants to talk to me? There's no ambiguity there. They heard that invocation of his right to silence and they continued to question. So there, an interpreter is perhaps an unusual situation. But the question is whether a reasonable officer would know whether or not someone has invoked. And when they asked him if he wants to speak with them, he said no is the response they got. The next question, however, that the officer asked to the interpreter was he doesn't want to talk to me? The follow-up question seemed to, the officer seemed to want to be certain that the, that your client didn't wish to speak to him. And then that led us down the road where eventually he did. But where he's already invoked his right to counsel, it's not been respected. He said he doesn't want to speak to officers, but they continue to ask. So then you think that once the interpreter said that, that the appellant said no, that the officer was incorrect in following up and assuring himself that your client did not wish to speak with him? That's correct. The he said no is a red light. There's no ambiguity and questioning should have ceased at that point. And where his invocation of his right to counsel and to silence were not respected, where they continue to ask him do you really want to speak with us and do not respect the fact that he has said no, I think it's unsurprising that he goes on to make a statement where his attempts to invoke both his rights are not respected when they should have. And when they were made clear to the officers and the officers, he said no. There's no ambiguity there. It's unreasonable for an officer to think that there is ambiguity. So then the questioning should have ceased at that point. Is it harmless beyond a reasonable doubt? The statement includes that he drank alcohol the night before. I think the jury hearing that he consumed alcohol is certainly not harmless beyond a reasonable doubt. Wasn't there another statement at the time he was arrested that had a similar statement? This one had greater specificity. And the jury heard, the jury saw the video of the ERI, of the interrogation. I think the prejudicial effect of that versus Officer Togiesi testifying to what he said at the hospital, I think the video recorded interrogation is much more prejudicial. There's greater specificity in that statement. And so it's not harmless beyond a reasonable doubt. Turning to the question. So there was an issue where there was something that was raised regarding white coating on his tongue after the accident. Was that ever delved into during the trial at all? If there was any part of the causation related to the intoxication or not? There was testimony from the defense expert that this Candida fungus infection can result in metabolism of alcohol in a blood sample after the fact. There was, I believe there was testimony from the nurse. I'm sorry. I believe there was testimony from an officer in his sort of check-in process after his arrest that there was some sort of white film observed. I think that was the primary testimony about that. Does that answer your question? Mm-hmm. Okay. Getting back to the interpreter. I hate to keep laboring this.  But, you know, it appeared that the interpreter was interpreting what people were saying and then responding instead of just relating back the information and relating back the answers. One example is when you mentioned that he said no, then that's exactly what she said. He said no, right, instead of just saying, you know, the answer to the question is no. I mean, do you want to talk to me? No. And then the officer could have required further. So I think that, at least when you listen to the tape, sounds like that might have contributed to the confusion that was going on during the custodial interrogation. So what does the interpreter say? What has he said now? There's simply no ambiguity there about whether or not he wanted to talk to them. So it is unusual to have an interpreter, but where these words are so clear, there's no ambiguity even based on what the interpreter said to the officers. Yeah. Turning to the retrograde extrapolation testimony. This is the third piece of evidence that should not have been admitted against Mr. Erdin. Counsel was ineffective for failing to object to this expert testimony about what Mr. Erdin's blood alcohol level was at the time of the accident because the expert did not consider the factors that Illinois courts have recognized are required for reliable retrograde extrapolation testimony. Those factors include age, gender, weight, height, mental state, the type and the amount of food in the stomach, the type and the amount of alcohol that was consumed, the time of the last drink, the time between the first and last drink, the time between the last drink and the blood test, the average absorption rate, the average elucidation rate. But his sentence testimony only considered four things, the time of the accident, the time of the blood draw, the value of the blood draw, and the average elimination rate. She essentially turned what is normally a complicated calculation into the algebra problem. So are those foundational elements or those elements go to the weight of her? What Floyd talks about is that when those factors aren't considered in determining if someone is in the elimination phase, then it's insufficient to provide a reliable calculation, and then that invites the jury to determine guilt on an improper basis. So where this calculation is not reliable because it hasn't incorporated these many factors that allow someone to determine if a person was in the elimination phase at a particular time, it's not a reliable calculation. And she did not consider anything particular to Mr. Erden whatsoever. So the fact that the defense also called an expert to counter the state's expert, I mean, doesn't that make it harmless to Erden? I mean, he got to testify about the BAC and everything else and the duration of alcohol in your system and so on and so forth. So he got his opportunity to present. But Ms. Simpson's testimony gave a particular value for the time of the accident, and her calculation was a very specific number that assumed he was in the elimination phase at the time of the accident. I don't think a defense expert is able to counter the specificity and the prejudicial effect of that testimony. I think the jury's questions during deliberations are also significant here where they clearly had some concern about the retrograde extrapolation testimony, but none of it considered the assumption that he was in the elimination phase. They asked, are we permitted to develop our own values to use in retrograde analysis to determine BAC at the time of the accident? If we have doubts about the elimination rate, can we make assumptions of other rates to determine if the BAC is greater than .08? None of that considers the assumption that's foundational to Ms. Simpson's testimony that he was in the elimination phase at the time. And all those factors that are mentioned in Floyd go to a reliable calculation that determines, again, that absorption elimination. Her assumption that his BAC had already peaked at the time of the accident is not founded on anything particular, and particular to Mr. Ervin or, again, all she uses is the time of accident, the time of blood draw, the value of the blood draw, and the average elimination rate. There's nothing specific to this case that would allow her to make the assumption that his blood alcohol level was declining at the time of the accident. So counsel was ineffective for not objecting to that testimony, in part because of how prejudicial it was for the jury to hear that specific value and that range. So for any or all of these three pieces of evidence that were admitted against Mr. Ervin that were incorrect, this court should grant a new trial. Is that what you're looking for, a new trial? That's correct. Okay. Thank you. Thank you. May it please the Court. Defendant was properly convicted, and this Court should affirm. I'll address Issues 1 through 3 just like Defendant, but if this Court has any questions for me about the sentencing issue, I would be happy to answer those as well. With regard to Issue 1, denial of Defendant's motion to suppress blood and breath testing was not against the manifest weight of the evidence. The officer credibly testified that he asked the Defendant to submit to the testing and that the Defendant agreed. The trial court also correctly found that Defendant was not detained and that his consent was truly voluntary. Defendant was not under arrest. He was not at a police station. He was not handcuffed. He was at a hospital at his own request. So I have a question about that. So they have to get an interpreter, but they want to make sure he understands what he's going to be going through, right? And when you look at the tape, the interpretation appears to be more of a command from the interpreter to him. He wants you to sign here. He wants you to do this. He wants you to do that. It's not whether or not this gentleman has an opportunity to voluntarily say yes or no. The interpreter is basically almost like giving him commands that he is being required to follow. Well, I want to distinguish two things. The interpreter on the recording is the ERI. So that is the post-Miranda interview that takes place at the police station later. No, I'm talking about at the hospital. Right. There's no tape recording of the hospital conversations between the Defendant and the police officer. It's in the record. That is the testimony of the Defendant in the motion, which the court rejected in favor of the police officer's much more credible testimony. The credibility issue there with the Defendant was exactly what you're describing. The Defendant said that when he was talking to the interpreter, he talked to the interpreter twice with the police officer, once about the breath test and once about the blood test. And what the Defendant claimed at the motion was that these two Mongolian interpreters, two different interpreters who were on the language line at two different points in time, both failed to interpret what the police officer said he asked, what the police officer asked him to do, and simply told him, turned those requests into commands to just submit to this test, sign here. That's what he claimed. The judge rejected that because it doesn't make sense that these interpreters would actually change what's being said. For example, the officer… And these interpreters weren't brought to court, correct? No, they were on a telephonic language line. No, I understand that. Right. And if I'm talking about when the suppression hearing was taking place, it was that these interpreters were not present to provide any live testimony. Right. The consent form was admitted into evidence at that hearing. The officer testified that he read the consent form and that the interpreter translated that into Mongolian. Now, the Defendant claimed that what was told to him wasn't what was on that consent form, but rather he was just told, sign what the police officer has there and do what the police officer says. Now, this is standard of review here, where it is whether or not the finding of the trial court is against the manifest weight of the evidence. That's the standard of review. And the trial court found the police officer credible. The police officer said, I asked him to submit to a breath test, and he agreed. I asked him to submit to a blood test. I read him the consent form, and he agreed. And that was through the Mongolian interpreter. So that's really what the court accepted, and that's really what this court needs to give deference to, not the Defendant's much less credible claims about interpreters ordering him around. Well, the trial court admits that there was a language issue here. And that there was some confusion as a result of it. Well, once again, I need to distinguish between the interpreters at the hospital and the interpreter on the ERI, because I would agree with you completely with regard to the interpreter on the ERI, and we have the opportunity to review that. And there absolutely was some confusion regarding that conversation. And I would point out what I think is really crucial testimony is that the detective testified that he spent hours trying to get a Mongolian interpreter who could actually come to the station to be able to face-to-face interpret for that interview. So it was actually delayed significantly because he didn't want to use the telephonic interpreter because he felt like that was going to make it more difficult to communicate with the Defendant. And I think what you see on the ERI is some difficulty in communicating as a result of the fact that it's going through the telephone and then to the Defendant, and then Defendant to the telephone to the detective. So what was the rush here? I mean, you know, I'm sorry. What was the rush here? I mean, why couldn't they just wait for an in-person interpreter? I think that that's something that I believe that this crash happened around 1130 a.m. and he wasn't interviewed by the detective until after midnight. So I think they did actually spend a significant amount of time trying to get that face-to-face, in-person Mongolian interpreter. But the exigencies of a law enforcement investigation, I think that it makes sense to move forward with the Mongolian interpreter. I'm a little concerned about going too far down that conversation because you're taking me to Issue 2. I haven't fully gotten an opportunity to make a consent. That's okay. You can go to Issue 2 if you like. If I could just very briefly point out a couple of things about the voluntariness of the consent on Issue 1 before I move on to that, because I am eager to have that conversation. But Defendant keeps talking about on Issue 1 the idea that he wasn't being treated at the hospital. And that's just false. If you look at the testimony of Nurse Cole at trial, she testifies that she gave him medical care. That's a direct quote. We don't have all the specifics of what medical care he received at that time, but we do know that she took his vitals. We do know that she got his history. She used the Mongolian interpreter, too, to give him medical treatment. And he was examined by a doctor. So he was there. He wasn't detained. The Nurse Cole also testified that the officer that she specifically asked the defendant if it was okay to have the officer in the hospital room, if he wanted him in the hospital room or not. And it also provides that he was emotionally upset, but was he also physically injured? Well, I think that's what the going to the hospital was about, because there are other records. He was going to the hospital because he was concerned about Mr. Orozco. Yes, and I think there's no reason to doubt that that was the reason that the defendant had for asking to go to the hospital. But I think the paramedic and I think that the hospital staff at the hospital had concerns about whether or not the defendant may have been harboring some kind of injury, and I think that they wanted to do an examination to make sure there was no injury, and they had that opportunity, which goes to the fact that he wasn't detained here. He wasn't under arrest. He was at the hospital receiving treatment, and he was asked to submit to a few tests. He had refused treatment at the scene to the paramedic, so he knew he could refuse treatment. He could have asked any questions he wanted through the Mongolian interpreter at the hospital, and he didn't. So based off of all that, his consent to the testing was absolutely, truly voluntary. Now, turning to the motion to suppress statements, I think there's a couple of things that really didn't get addressed in your conversation with folks in counsel that I want to highlight. First of all, the judge's ruling on the motion to suppress statement, the absolutely clearest ruling, the immediate ruling on that was that it was untimely. Yes, he made comments after he saw the ERI. The judge made comments about what he thought the video showed and how that would impact a potential motion to suppress statement, but there was no motion to suppress statement filed here because the defense brought this up for the first time at trial, and the way the defense brought it up was they asked for a sidebar, and the defense said, we just want to preserve this issue for the record. That's very telling because it goes to the question of trial strategy, which I'm going to address in a minute, but the fact that the defense counsel waited until trial and then asks for a sidebar and says, I just want to preserve this Miranda issue, he's clearly not making a serious attempt to keep that video out. What he's doing is he's trying to let it in so he can use it himself, but at the same time preserve the Miranda issue for appeal, and the judge did the exact correct thing. He said, I have to disagree with you, counsel. You're not preserving anything because you didn't file a timely motion to suppress statements here, so you can raise an objection now, but I'm denying it as untimely, and that is the ruling that this court should be reviewing is the denial of the motion to file the motion to suppress statements based on untimeliness, and that's an abuse of discretion standard because that goes directly to the trial court's ability to control its courtroom and to control the trial. During that conversation, the judge at one point was kind of thinking out loud and was saying, well, I can dismiss the jury for the day, and we can start calling witnesses on this motion to suppress statements, and we can get a ruling by the end of the day and then have the jury come back tomorrow. So there was some consideration of that possibility, but that was absolutely within the discretion of the trial court to say no. You had three-and-a-half years. You had this ERI for three-and-a-half years, and you didn't file a motion to suppress statements in that time. I'm not going to stop this trial just to do that. That was kind of... Well, I would reconcile that with the judge's comments that he's aware at that point in time, particularly with regards to custodial interrogation, that there was some confusion, that it was confusion as a result of maybe the interpreters. So how do you reconcile moving this along without saying let's stop, let's have a motion to suppress hearing, and let's proceed to make sure that we have a clean trial error? Well, I can explain that really easily because it's actually two separate conversations. There's the sidebar where the judge says this is untimely and I'm not going to allow it. Then the trial continues. At the end of the day, then the judge puts on the record his interpretation of the ERI, where he observes the ambiguity created by the interpreter. And the reason that he made those comments at the end of that day of the trial was because he had, in that first conversation in the sidebar, he had expressed explicit concern about a possible claim of ineffective assistance of counsel or plain error. So when he denied the motion, denied the filing of the motion as untimely, he said, well, you know, I realize that may be creating a claim of ineffective assistance or plain error. But at the end of the day, after he saw the ERI, after he saw the fact that what your honors can also see when you watch that ERI video, that the officer, the detective, was in good faith trying to clarify exactly what he was being told through the interpreter. After the judge had seen that ERI, then he made the comments that he made, saying that this was a- Let me ask you a question. Under Miranda, are there any particular magic words that must be stated when you say you want to talk to your attorney? No, it absolutely is a totality of the circumstances assessment. And it's what a reasonable- So what if he mentions it once? Is that enough for a police officer to stop? It depends on what's being said. There are a lot of ways that you can ambiguously refer to an attorney. So what if he mentions it twice? Well, I'm not sure. In this hypothetical, you're on a- It's not a hypothetical. Okay. This gentleman mentioned the word attorney four times before he started talking to the police officer. So that's what I'm asking. When is enough enough? He said four times prior to talking to the police officer, the word attorney. The word attorney. Well, there's a lot of ways that you can say the word attorney when interacting with a detective, and not have it be an unambiguous invocation of your right to counsel. I don't want an attorney. I could say I don't want an attorney as many times as I want. That's not what he said. No, but he did say I don't want an attorney three times. He didn't say I don't want an attorney. He said attorney. That's the word attorney. In a sentence, and that sentence had a peculiar turn of phrase. He said, I have an attorney, but he said he didn't want to talk to the police officer. What about that? I'm sorry? What about the fact that he said he didn't want to talk to the police officer? I think that if there weren't an interpreter issue here, then that would be unambiguous. But I think in this situation with the interpreter, with the kind of confusion, and he already said I don't know a couple of times through the interpreter at that point, and when you look at the question that the detective asks in response to that, he's not badgering the defendant. He's not saying, are you sure you don't want to talk to me? Do you really not want to talk to me? He just says he doesn't want to talk. That's it. He's just specifically confirming that that no is what he thinks it is. And the response he gets is, so he says, I don't know exactly, but he should talk. I talk to an attorney first, or I don't know. That is what the interpreter says next. So the sentence. Let's explore something you said a little earlier, and you're touching upon it now, and that is that there was some confusion, and you're emphasizing, I think, that there was some confusion because of the interpreter and going back and forth. Yes, sir. Do you think that that would have some effect on whether or not if, in fact, he was waiving his rights under Miranda, do you think that would have some effect upon whether or not that was a knowing waiver? Tell me why you think not. Because those are two totally different things. The confusion and ambiguity that I think made it logical and reasonable for the officer to ask one clarifying question after the no is just the fact that he can't talk directly to the defendant. You have this intermediary. And that's creating ambiguity. But that doesn't mean that there's any ambiguity or unclarity in the mind of the defendant about what he intends when he's giving these answers. So it's a matter of ambiguity in communication versus ambiguity or uncertainty in the understanding inside the defendant's mind. Those are two completely different things. So you believe that there may have been some ambiguity in the back and forth in the conversation, but that would result in no ambiguity in the mind of the defendant when he's waiving his rights under Miranda. I think what the defendant does express is some uncertainty about whether or not he wants a lawyer. And that's what creates the ambiguous situation. But in terms of whether or not he was a knowing and voluntary waiver, I think that what you have on that EI by far establishes what's necessary in order to establish a knowing and voluntary waiver. We don't have any of those factors that one looks for in a situation where someone's Miranda waiver is found to be involuntary or unknowing. None of that's here. This is somebody who is absolutely effectively interacting with law enforcement, with the interpreter. He's absolutely capable of waiving his right to an attorney. It's just he wasn't sure if he wanted to or not. I'm not speaking about his capability. We're not speaking about the capability. This isn't one of those situations. Just that in order for him to waive his right to sign that document, it is necessary that one understand that one is waiving that particular right.  My concern, or at least my question towards you, my question to you, concerns even your own comments where you, I won't use the word admit it, but you stated that there appeared to be some confusion between what was going on as far as having the interpreter there. So much so that the officer even considered bringing in a live person rather than doing this by telephone. And so I think that raises some concerns about whether or not he actually understood what he was waiving. I completely disagree with you, Your Honor. I'm not taking a position. I'm merely asking questions. I completely disagree with the premise of that question. I see. I think that the Miranda warnings are read to him at the beginning of the ERI through the mongolian interpreter. There's no claim that the interpreter got those wrong. If you're an interpreter on call, being able to accurately interpret Miranda's got to be at the top of the list of things that you can do pretty well. After all this conversation happens, he gets re-Mirandaized again afterwards. So the reason why I was going to sort of issues of capability is because those are really the kinds of things that we become concerned about. If the Miranda warnings are effectively and correctly given, then a person of average intelligence is absolutely going to be able to make a knowing and voluntary waiver. Now, is it a strategically beneficial decision for them in their potential future case? Maybe, maybe not. But that's not the question of knowing and voluntary waiver. So I think that the real confusion here goes to the point that all of the defense counsel's cases with regard to, you know, a no means no type situation, none of those address a situation where in good faith the officer is simply asking one follow-up, does that mean he doesn't want to talk to me? That kind of like good faith follow-up when there's an interpreter and there's been already some ambiguity in that. Opposing counsel had her entire reply brief to offer a case to this court where an interpreter was involved in this kind of situation. The reply brief contains no such case. I would offer to your honors that there is no case that addresses this specific issue. And because the question of whether or not invocation, unambiguous invocation occurred, is a totality of the circumstances question. The interpreter here and what you can see in the ERI absolutely has to be taken into account. So I have a question. So the officer starts reading the Miranda rights. Yes. And he reads the very first sentence of the Miranda rights. And then the defendant responds. But then the interpreter says, and he's going to start by reading the next one, just read them all. All right. So how do we know what his responses are to each question? Because each question wasn't necessarily asked individually the way Miranda is supposed to be read. Because after the first one, then, you know, she tells him, read them all, and then he does, and then, you know, she gives a response. I don't think the court needs to concern itself with that particular interaction because that wasn't the final Miranda waiver. After the back and forth when the defendant says that he will talk to the officer, then they go through the written Miranda waiver, and they go through each right separately. Each right is interpreted separately, and then the defendant is asked to initial that right, and then they move on to the next one. So that first Mirandizing told the defendant everything, but if the court's concerned about, you know, specifically knowing each right separately, that was addressed at the end of the video. As it said, it's just past 11 minutes into People's Exhibit 52. That's where the detective goes through the Miranda waiver one right at a time, and the defendant acknowledges understanding each one and initials them. So there was an issue about strategy, supposedly strategic strategy.  So what was defense counsel's strategy? So here's the thing. Defendant drove over cones and killed an IDOT worker who was doing landscaping work. The jury saw the video from the camera in the defendant's car. It's horrifying video. You can just see the vehicle plowing into a human being without even attempting to swerve. The black box tells us that he didn't slow down until less than a second before he struck this human being. Didn't swerve. And so in those circumstances, defense counsel, number one priority, had to provide the jury with a different explanation for the bad driving, something other than the fact that he was drunk, because when you look at those circumstances... Was there any evidence of erratic driving before he hit the cones? There's no evidence of any kind of driving. The testimony in this case starts... Didn't he have a camera in his car or something? I don't believe that the video that was introduced into evidence went back very far, so I don't know how far it went back. But let's presume that there wasn't any previous erratic driving. The fact that he just plowed into that work area at a speed of, I believe it was 47 miles per hour... It was 26. That was after he struck the victim. I believe the testimony was that immediately before that, before the brakes were applied only... According to the record, he was going 37 and he reduced to 26 miles per hour. Okay. 37. I apologize for that. In those circumstances, one of the strongest explanations for that happening, that horrific driving, is that the defendant was drunk. And based on all the testimony, we know he was over the legal limit. We can talk about foundational questions, but he had a breath test and blood test multiple hours later. He was still really close to the legal limit. But one explanation is that he was drunk. The other explanation, the one that defense counsel chose to present, was that he was distracted. And in opening statement, he told the jury, defendant wasn't drunk, he was distracted. And so the defense counsel needed an explanation for why defendant was distracted. And he got that explanation through the ERI video. Because the defendant said he dropped his cell phone and tried to reach for it. And that's why this crash happened. If this prosecution hadn't put that in, or if the defense had kept that ERI out, the defense wouldn't have had an explanation for that bad driving. But because that came in, and that's why I pointed out earlier that when he objected to this at trial, he was saying that he was trying to preserve the issue. He wasn't really trying to keep this video out, because he needed the video to explain, because it was a mitigating statement that the defendant made. And through the cross-examination of the detective, the defense counsel was able to corroborate that by saying, and you found that to be a believable statement, right? And the detective said, yes. And in fact, you found the cell phone in the defendant's car. Yes. So what the defense counsel got from that ERI was so much more valuable than what the prosecution got from that ERI. Of course, the prosecution is going to put the ERI statement in. It's cumulative of other statements about drinking that the defendant made, but it's part of the evidence in the case, and of course the prosecution is going to put it in. But it's the defense that made it the centerpiece of their closing argument. Throughout the closing argument, he's talking over and over and over again about this cell phone, because it's that distraction that can potentially explain away this horrific driving. It was a good strategy. It didn't work in this case, but it doesn't mean that the defense counsel was ineffective. So going along with that theory, Quinnian still presented a motion to suppress to keep out the portion about the Miranda's, right? Have the tape redacted and then have the jury only see that part in terms of what he wanted to make sure that the jury saw. No, I think if you're going to seek to suppress the statement for improper Miranda, then you've essentially kept the prosecution from introducing that statement. And you can't put it in yourself, because that's your own statement. It has to be a statement of a party opponent. That's why the prosecution has to put it in, and that's why the defense didn't really want to stop him from putting it in, because it helped them. And the only way they could do that was by sitting on their hands, not trying to suppress it, and then once it happens at trial, because he was a good attorney, he's thinking about all the ways he can benefit his client. So in addition to getting this video in that gives him a defense, he's also going to preserve the Miranda issue, because it is an arguable issue. There's something there to argue about, so he sees that and he tries to preserve it. But the thing that he did that the court got right was the court denied it as untimely, and that was the right ruling, and that was not an abuse of discretion. And even if you might disagree with the characterization that the trial court has of what happens on that ERI, this court can affirm based on any basis in the record, and I would urge this court to affirm based on the fact that it was untimely and that that was not an abuse of discretion. I realize I've been talking for a while, and I would just very briefly like to address issue three quickly, and that is... Before you go on, can you tell me whether or not, if there is a Miranda issue here, whether you've demonstrated that it would be harmless beyond a reasonable doubt? Oh, it's tremendously harmless because of the fact that it's a mitigating statement that he makes. He admits to drinking some alcohol. Yes, the jury gets to watch the ERI of the defendant admitting to drinking alcohol, but there was already credible testimony from the police officer that when he arrested the defendant, the defendant said, why are you arresting me? I only had one bottle of alcohol yesterday. So there was already testimony. There was already a statement about him drinking. Getting into specifics didn't really move the needle significantly for the prosecution, and I think you have to consider how valuable it was to the defense and how the defense, it was the centerpiece of their closing argument when you're looking at the harmlessness as well. With regard to issue three, the defense counsel is not ineffective for failing to object to the retrograde extrapolation. This whole issue is just a faulty comparison to the Floyd case, but there's three really important distinctions between Floyd and the case at bar. First is there's two tests here, the breath test and the blood test. In Floyd, there is just one test, and based off those two test results, we know for a fact that the defendant was in the elimination phase because he was actually eliminating alcohol. The breath test was higher than the blood test, and it was an hour and ten minutes difference. We also know the defendant's actual rate of elimination because we know how much time passed between those two tests, and that's what the jury notes were about. The jury was essentially figuring out the actual rate of elimination based off of the fact that it went down .011 over an hour and ten minutes. Well, that's not their expert because that's what they're arguing. They're saying that the state's expert honed in on the elimination part of the test and that that's what was more harmful and that ultimately led to jury questions when the jury was considering the evidence of the two experts, but they're saying that their expert didn't really get an opportunity to get into that. Their expert had the opportunity to get into everything. Their expert attacked all the assumptions that the prosecution's expert relied on, and it's kind of ridiculous to compare this case to Floyd because in Floyd they found that the defense counsel was ineffective for failing to raise an objection to an assumption. Here, defense counsel put on a whole witness who did nothing but talk about those assumptions for a couple of hours. So clearly this isn't a situation of ineffectiveness. This was a situation where the facts were different from Floyd. There are two tests and there were also statements. There were no statements in Floyd, so part of the problem about Floyd and knowing when the defendant had entered the elimination phase and specifically whether or not he had entered it at the time of the crash was the fact that there were no statements by the defendant about when he stopped drinking in Floyd. Here we have those, so we know for a fact because it wasn't within he wasn't still drinking 30 to 90 minutes before the crash. We know he was in the elimination phase. Both experts in this case both agreed that 30 to 90 minutes is all it takes for you to go into the elimination phase if you're not still drinking, and that 30 to 90 minutes depends on how much food you might have consumed as well and maybe what kind of alcohol you consumed. But all of those other factors, all those other personal characteristics, that all goes to the rate of elimination. It doesn't go to how long it takes to get you into the elimination phase. That's just the 30 to 90 minutes depending on food. And so in this case, because of the statements, we know when he stopped drinking. We know he was in the elimination phase, so we know he was very significantly above the legal limit at the time of the crash. And so the jury was absolutely correct to find him guilty of the over .08 charge in addition to the reckless homicide, in addition to the driving under the influence. If there are no further questions for the reasons in our brief as well as the ones presented here, the people ask you to affirm defendant's conviction and sentence. Thank you. Thank you. Ms. Butler? Just a couple of points on each one of the pieces of evidence. First on the blood and breath test, counsel talked about it being against the manifest weight of the evidence. The review was de novo on the question of whether or not he could voluntarily, whether the consent was voluntary. And taking Officer Togiesi's account as the more credible, the circumstances are still, would not allow a reasonable person to believe they could, they were free to leave or to refuse testing. And regarding the consent form that he signed, that was a hospital consent form that informed a person signing that samples would be tested for alcohol and drugs and sent to an Illinois Department of Health lab. It did not inform of any right to refuse or that they would be used in prosecution. And factors that are considered in whether or not consent was voluntary include whether or not someone is advised of their constitutional rights or right to refuse. So all that to say, again, this Court's review is de novo on that ultimate question of whether or not the consent was voluntary. On the statement, if there was confusion related to the interpreter, then a reasonable police officer should have even more scrupulously honored any indication of a right. And there was simply nothing that needed to be clarified. When he invoked his right to counsel, the question was about accessing counsel. And then when he did not want to speak to police, he was crystal clear. And what the interpreter said was he said no, there's nothing to clarify, and questioning should have ceased. What about the State's argument that they actually went over the Miranda rights again, and they went at it by piecemeal? Well, there's an indication a statement might be admissible if there's like a longer break in time and a fresh set of Miranda warnings, but there's no break in questioning here whatsoever. They sort of continue to prod and say, are you, you know, essentially sort of like, are you really sure about that, instead of scrupulously honoring the indication that he made. So had they honored it, had there been a break in time, had there been a fresh set of Miranda warnings, that might have been adequate. That's not the circumstances here. And just regarding prejudice, the statement has specifics about what alcohol he consumed. That is prejudicial. The State is implying that it was a proponent of a piece of evidence that was not helpful to it. That's not the case here. It prejudiced Mr. Erden to have this statement admitted against him. And any issue with the timeliness of presenting the objection, that's ineffective assistance. And I believe counsel said that it was an arguable motion. I certainly think that this Miranda violation is well within what Illinois courts recognize as invocations, and so that motion would have been granted. It was not a strategic decision to not raise it. And the counsel's statement about why he didn't, he had thought the issue not quite there, is about legal knowledge, not about strategy. And then on the issue of retrograde extrapolation, there's just one test that forms the basis of this expert's opinion. Nothing specific about Mr. Erden. And, again, whether or not someone is in the elimination phase requires this complex calculation. While the two tests may indicate he was in the elimination phase at the time of the breath test, that was two and a half hours after the accident. And when all of these complex considerations go into when someone is in that phase, this specific number about his blood alcohol content at the time of the accident that is inconsistent with him passing field sobriety tests, with his demeanor at the scene of the accident, with the fact that EMTs, the officer, the officer does not suspect anything until he gets a whiff of alcohol after 20 to 30 minutes on site. The implication that it is obvious that that was his blood alcohol content at the time of the accident is just not consistent with much of the other evidence presented in this case. And where this expert could testify to that value without considering these many other factors is ineffective assistance for counsel not to object to that testimony. If there are no further questions, then I will submit the case. Thank you, both of you, for a very interesting case. Thank you very much. We will take this matter under advisement and issue a written order in a reasonable length of time. And with that, the matter is adjourned. All rise.